FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2019 APR -9 PM 2: 39

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. '19 - CV - 01045

UNITED STATES OF AMERICA,

Plaintiff,

*ex rel.* JENNIFER MOEHRING-SCHMIDT,

Plaintiff-Relator,

v.

DYNAMIC PHYSICAL THERAPY, LLC, and
EMAD YASSA,

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**[FILED UNDER SEAL]**

## INTRODUCTION

1. Plaintiff-Relator Jennifer Moehring-Schmidt ("Plaintiff-Relator" or Ms. "Schmidt"), by and through her counsel SWAIN LAW, LLC and LOWREY PARADY, LLC, on her own behalf and on behalf of the United States of America ("United States"), brings this action pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA") against the Defendants Dynamic Physical Therapy, LLC ("DPT") and its owner Emad "Eddie" Yassa ("Yassa").

2. Defendants have engaged in numerous fraudulent practices, which resulted in the knowing submission of false claims to the government of the United States.

3. Defendants' actions constitute a fraudulent scheme that has resulted in (a) the presentment to the United States of false or fraudulent claims for payment under federal health care programs relating to reimbursement of physical therapy medical claims; and (b) the making or use of false records or statements material to the false or fraudulent claims relating to physical therapy treatment and expenses.

4. These practices not only result in Defendants' unjustified and fraudulent enrichment at taxpayer expense, but have endangered the health and safety of DPT clients.

5. Accordingly, Ms. Schmidt files this Complaint on behalf of the United States of America to recover civil penalties, damages, declaratory relief, injunctive relief and such other relief as is available under the FCA, and hereby demands a trial by jury.

## JURISDICTION AND VENUE

6. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Further, this Court has jurisdiction pursuant to 31 U.S.C. § 3732, which specially confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730.

7. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because this Court has personal jurisdiction over at least one Defendant who can be found in, resides in, transacts business in, or has performed acts proscribed by 31 U.S.C. § 3729 within this district. In addition, venue is proper in this district because at least one Defendant has caused false claims to be made or certified in this district.

## PLAINTIFF-RELATOR

8. Plaintiff-Relator Jennifer Moehring-Schmidt is a citizen of the United States of America, and currently resides in the State of Kentucky.

9. At times relevant to the allegations described in this Complaint, Ms. Schmidt resided in the State of Colorado.

10. Between May 2013 and May 2014, Ms. Schmidt worked for Defendant DPT as a physical therapist in Colorado Springs, Colorado.

11. Plaintiff-Relator has complied with all conditions precedent to the filing of this action. Plaintiff-Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based. As required by 31 U.S.C. § 3730(b), Plaintiff-Relator has voluntarily provided information, oral and/or written, and has served disclosure statements of substantially all material evidence, information, and documents related to this Complaint on the United States government.

12. As described in more detail below, the Plaintiff-Relator first made a voluntary disclosure of the allegations in this Complaint to the United States on May 9, 2014. Specifically, Ms. Schmidt disclosed the allegations in this Complaint to the United States Federal Bureau of Investigation ("FBI") and the Center for Medicare and Medicaid Services ("CMS").

13. After Plaintiff-Relator voluntarily disclosed the allegations in this Complaint to the FBI and to CMS, the FBI and/or CMS proceeded to open investigations into the Defendants' billing practices. In June 2018, FBI agent Debbie Sikiyan informed Ms. Schmidt that the FBI's investigation remained open and active, and that the FBI was currently interviewing patients of DPT.

14. Ms. Schmidt is an original source of all information discovered by the United States as a result of her May 2014 voluntary disclosures to the FBI and to CMS.

15. Before filing this Complaint, Plaintiff-Relator made a second voluntary disclosure of the allegations in this Complaint, in writing, to the United States pursuant to 31 U.S.C. § 3730(b).

16. There has been no public disclosure of the allegations brought by the Plaintiff-Relator herein.

17. In the event that any public disclosure has occurred, Plaintiff-Relator is an original source of all the allegations within the meaning of the federal False Claims Act, 31 U.S.C. § 3730(e)(4).

## DEFENDANTS

18. Defendant Dynamic Physical Therapy, LLC is a Colorado limited liability company that at all times relevant to this complaint has owned or managed physical therapy clinics located at:

   a. 5775 North Union Boulevard, Colorado Springs, CO 80918; and

   b. 2855 International Circle, Colorado Springs, CO 80910.

19. Defendant Emad Yassa is the principal owner of DPT and is a resident of the State of Colorado. He is licensed as a Physical Therapist by the State of Colorado.

20. Defendant Yassa is also known by the alias "Eddie Yassa."

21. Defendant Yassa refers to himself as "doctor" and introduces himself as "Doctor Yassa" to DPT customers. Though Yassa claims to hold some type of degree from Cairo University, Yassa has does not have a doctoral degree from a university accredited in the United States and is not a doctor.

## GOVERNMENT PLAINTIFF

22. The governmental plaintiff in this lawsuit is the United States of America.

## FACTUAL ALLEGATIONS

23. Dynamic Physical Therapy, LLC, provides physical therapy services to patients with Medicare, Medicaid, Tricare, and private health insurance. On a per-patient, per-treatment basis, DPT makes more money off of patients with Medicare, Tricare, or private health insurance than it does off of patients with Medicaid.

24. Ms. Schmidt began working for DPT as a physical therapist in or about May 2013.

25. Ms. Schmidt's physical therapist duties at DPT included, among other things, providing physical therapy services to patients and creating records of services that had been provided, which were then used by DPT to create reimbursement request claims to be sent to Medicare, Medicaid, Tricare, and private health insurance companies. These medical records, which DPT uses to generate reimbursement requests, are known as "superbills" or "charge sheets."

26. During Ms. Schmidt's employment, DPT employed approximately nine (9) physical therapists, physical therapy assistants ("PTAs"), and occupational therapists. Each treated approximately sixteen (16) patients per day.

27. On average, therapists and PTAs spent approximately thirty (30) minutes with each patient per session, but (as discussed in more detail below) therapists and PTAs generally spent less time with Medicaid patients during their appointments.

28. Physical therapists treated patients and were empowered to create and revise each patient's plan of care, which is the document that explains the patient's therapy regimen and the types of treatment the patient should receive during the patient's appointment.

29. During Ms. Schmidt's employment, PTAs treated approximately the same number of patients as physical therapists, but were not empowered to create or revise plans of care. PTAs frequently treated patients after Yassa had met with the patient for an initial evaluation and created the patient's plan of care.

30. Approximately seventy to eighty percent (70-80%) of DPT's patients were enrolled in Medicare, Medicaid, or Tricare. The remainder were uninsured or covered by private health insurance.

**The Defendants required therapists to meet with patients three (3) times per week and always record at least four (4) reimbursable units of treatment, regardless of how much treatment was medically necessary or actually performed.**

31. Throughout Ms. Schmidt's employment at Dynamic Physical Therapy, DPT and Yassa maintained a policy that all physical therapists, PTAs, and occupational therapists (collectively, "therapists") employed by DPT were required to bill a minimum of four (4) units of physical therapy treatment with each patient during every appointment. The Defendants required a minimum of four (4) units of treatment to be recorded and billed for each patient regardless of the

6

patient's medical needs or the amount of physical therapy actually performed. Defendants mandated that physical therapists record four (4) units of treatment even if the physical therapist did not perform four (4) units of treatment.

32. Yassa repeatedly and openly threatened that employees would receive verbal and written warnings and could be fired if they did not bill at least four (4) units with each patient during every appointment. In addition, Yassa repeatedly coerced DPT employees by threatening that DPT would be unable to pay their wages if each therapist did not record at least four (4) billable units with each patient.

33. In conjunction with Yassa's emphasis on the importance of DPT's minimum-billing policy, Yassa also instructed therapists to spend "minimal" time with Medicaid patients so they could have more time to meet with more-profitable Medicare, Tricare, and private insurance patients.

34. However, Yassa made clear that he still required therapists to record at least four (4) units of treatment for Medicaid patients. He stated that he expected DPT's therapists to spend less time with Medicaid patients and conclude their appointments as quickly as possible.

35. Yassa instructed therapists to double-book appointments with Medicaid patients and non-Medicaid patients when DPT's schedule was already fully-booked. On occasions when both patients showed up, Yassa had a standing order for DPT's receptionists to falsely inform the Medicaid patient that he or she had made a mistake and shown up at the incorrect time.

36. On some occasions when a Medicaid patient and a non-Medicaid patient both showed up for a double-booked appointment, Yassa would "treat" both patients at the same time, and bill at least four (4) units of treatment for both patients. Yassa did so by putting the Medicaid

7

patient in a treatment room with heat and electric stimulation (or on a massage table) for the entire appointment while he personally treated the non-Medicaid patient.

37. In addition, Yassa instructed therapists to schedule three (3) therapy sessions per week with each patient. DPT policy required three (3) sessions per week regardless of whether such frequent treatment was medically necessary or beneficial to the patient. Yassa instructed DPT's therapists to do so with the goal of generating claims for medically-unnecessary physical therapy services.

38. During Ms. Schmidt's employment, Yassa fired a physical therapist called Maria Dizon-Correa[1] ("Correa") for refusing to schedule more frequent visits than were medically necessary. In or about March 2014, Correa told a DPT receptionist not to schedule three (3) sessions per week with her patients as a matter of course because doing so was "unethical." As a result, Yassa terminated Correa's employment.

**The Defendants fraudulently altered treatment records to add false claims.**

39. In or about August 2013, Ms. Schmidt discovered that Yassa had altered one of her charge sheets to include false claims for treatment that had not been provided to the patient.

40. That month, one of Ms. Schmidt's physical therapy patient was required to leave her appointment early. After ending the physical therapy session early, Ms. Schmidt walked the patient out to the patient's car to say goodbye and watched the patient drive away.

41. As a result of the patient's early departure from the appointment, Ms. Schmidt provided only three (3) units of physical therapy treatment to the patient, and Ms. Schmidt documented three (3) units of treatment in the patient's "charge sheet."

---

[1] Upon information and belief, Maria Dizon-Correa is now known by the name "Ochie Dizon."

8

42. The following week at the patient's next appointment, Ms. Schmidt observed that the patient's "charge sheet" had been altered to falsely reflect that four (4) units of treatment had been provided to the patient during the prior week's appointment.

43. The fourth unit of treatment that had been added to the charge sheet was for "cervical traction" treatment, a skilled treatment with a relatively high reimbursement rate under Medicare and Tricare compared to unskilled treatments.

44. Ms. Schmidt asked Correa, who at that time was still working as a physical therapist for DPT, about the addition to the charge sheet, and Correa responded that she believed that Yassa had added the extra unit. Correa added that because she had repeatedly noticed units of treatment that had been added to her charge sheets by Yassa after she turned them in to DPT, she had started crossing out the blank spots in her charge sheets with an "X" mark before turning them in. Correa explained that she did so to prevent Yassa from continuing to manipulate the charge sheets.

45. Upset that her charge sheet had been manipulated to contain an inaccuracy which could jeopardize her physical therapy license, Ms. Schmidt complained to Yassa about the added unit.

46. Yassa admitted that he had added the additional unit, and claimed that he had personally performed one (1) unit of cervical traction therapy with the patient because Ms. Schmidt had had to leave the appointment early. Ms. Schmidt told Yassa that she knew his explanation was untrue because the patient – not Ms. Schmidt – was the one who had left the appointment early, and that Ms. Schmidt had personally observed the patient get in her car and drive away from DPT. Caught in an obvious lie, Yassa had no response.

**In addition to altering the charge sheets of other DPT therapists, Yassa regularly recorded false claims on his own charge sheets.**

47.  After Ms. Schmidt caught Yassa manipulating her charge sheets to add false claims of additional physical therapy units, Ms. Schmidt observed additional instances of billing fraud in February 2014, when she observed that Yassa had been regularly adding false claims to his own charge sheets.

48.  In February 2014, Yassa assigned Ms. Schmidt to treat some of his patients while he was out of town on a trip abroad. To prepare for treating Yassa's patients, Ms. Schmidt reviewed his treatment notes, which were very detailed. Yassa had documented and billed for many different exercises, laser treatments, and manual therapies for each client.

49.  However, when Ms. Schmidt met with the clients, they denied having ever received the treatments that Yassa had recorded.

    a.  **Patient One**

50.  For instance, during a meeting with a patient pseudonymously called "Patient One," Ms. Schmidt observed that Patient One's charge sheets indicated that Yassa and the patient had been performing a certain treatment exercise called a "bridge" several times per week for months.

51.  Ms. Schmidt explained the exercise to Patient One and demonstrated the exercise to her. Patient One stated that she had never heard of the exercise, and denied ever having done it with Yassa. Ms. Schmidt performed the bridge exercise with the patient and knew from observing the patient doing the exercise that the patient had never done the exercise.

52.  After realizing that Yassa had been falsely documenting treatment that he had not provided, Ms. Schmidt asked Patient One what she and Yassa usually did during her appointments.

10

53. Patient One responded that Yassa would leave her alone sitting in the treatment room on a massage table for approximately twenty (20) minutes, then return and massage her back briefly before terminating the appointment.

54. Yassa had been falsely documenting Patient One's massage table treatment as "lumbar traction" and/or manual therapy, which are skilled therapy units that have high reimbursement rates.

    b.    **Patient Two**

55. Ms. Schmidt met with Patient Two, a Medicaid enrollee who was approximately in her late teens or early twenties, on February 10, 2014. Patient Two arrived at her appointment with her mother.

56. Ms. Schmidt noticed in Patient Two's charge sheets that Yassa had repeatedly recorded and billed two (2) units for "therapeutic exercise" and two (2) units for "manual therapy" during appointments with Patient Two. However, both Patient Two and her mother reported that neither Yassa nor anyone else had ever performed these exercises with Patient Two.

57. Patient Two and her mother also informed Ms. Schmidt that they preferred to work with Ms. Schmidt or a PTA named Albert Levingston instead of working with Yassa.

    c.    **Patient Three**

58. Later, Ms. Schmidt observed that Yassa had recorded and billed five (5) treatment units for an initial evaluation session with Patient Three (a Tricare enrollee in her thirties).

59. During her appointment with Ms. Schmidt, Patient Three informed Ms. Schmidt that Yassa had not given her any exercises to do at home and he had not performed any exercises with her in the clinic.

11

60. Yassa had also recorded and billed units of "laser treatment," but Patient Three reported that she had not received laser treatment when Ms. Schmidt explained and demonstrated the treatment to Patient Three.

### d.  Patient Four

61. Ms. Schmidt treated Patient Four (one of Yassa's patients who was a Medicare enrollee) on February 20, 2014.

62. Once again, Ms. Schmidt observed that Yassa had recorded five (5) units of treatment during Patient Four's most recent visit, and Patient Four denied ever having received the treatment.

63. Patient Four informed Ms. Schmidt that Yassa only performed dry needling with "the electrical stuff," which Ms. Schmidt identified as trigger point dry needling with electrical stimulation treatment.

64. Dry needling can lawfully be charged on billing sheets as manual therapy, and can be submitted for two (2) units of treatment if performed on the patient for a sufficiently long period of time. Needling treatment can also be coded as "neuromuscular re-education," but cannot be charged as separate units of both neuromuscular and re-education manual therapy.

65. Therefore, Ms. Schmidt realized, Yassa had been repeatedly recording and billing the same treatment. Based on Patient Four's reports to Ms. Schmidt, Patient Four's charge sheets should have reflected three (3) units of treatment (2 manual and 1 electrical stimulation) instead of five (5) units.

66. Simply put, Yassa had been double billing Medicare for Patient Four's treatment.

### Ms. Schmidt confronts Yassa about his scheme.

67. While Ms. Schmidt was treating Yassa's patients during his February 2014 trip, she observed at least eight (8) different patients for whom Yassa had been falsely documenting skilled therapy treatments. Yassa submitted false reimbursement claims to Tricare, Medicare, or Medicaid treatments that had not been provided.

68. Upset that Yassa was including false billing claims for all of his patients, Ms. Schmidt confronted Yassa and DPT Practice Manager Monna Yassa (who is Defendant Yassa's wife) upon their return from their trip abroad. Yassa denied that he had been upcoding and including false claims. His only excuse was that patients sometimes don't remember which therapy they have received.

69. After Ms. Schmidt confronted Yassa, she began noticing other instances of Yassa's billing fraud. For instance, though Medicare does not reimburse physical therapy providers for group pool therapy, Ms. Schmidt learned from talking to other DPT therapists that Yassa regularly held group pool therapy and submitted false claims to Medicare for individual pool therapy for each participant.

70. Yassa and DPT regularly and knowingly submitted similar false claims for all of the patients Yassa treated. Yassa almost always billed between four (4) and seven (7) units of treatment for his patients.

71. In addition to filing false claims for Medicare and Medicaid reimbursements, Yassa falsified Functional Capacity Evaluations (FCE) for private clients of DPT. Yassa reported spinal measurements on FCEs, but DPT did not even have the equipment necessary to perform these

measurements. Despite knowing the measurements were false, Yassa sought reimbursement from these private companies for FCEs.

72.     In seeking reimbursement from Medicare and Medicaid based on false claims of services provided, Defendants DPT and Yassa knowingly caused the submission of false claims to the United States. The United States has suffered significant damages as a result of false claims for payment of services that were never rendered and for medically unnecessary services.

### Yassa's false claims scheme also jeopardized the health and safety of DPT patients.

73.     In addition to defrauding the United States and taxpayers, Yassa's scheme to fraudulently maximize reimbursements also endangered the health and safety of patients under DPT's care.

74.     For instance, in March 2014, a Tricare enrollee became a patient of DPT after undergoing rotator cuff repair surgery.

75.     Yassa performed the patient's initial evaluation and developed a plan of care for the patient that did not include range of motion therapy or any goals for shoulder range of motion, which is the standard procedure for new patients who have undergone shoulder surgery and which had been ordered by the patient's orthopedic surgeon.

76.     Instead of including range of motion treatment or goals to regain mobility in the patient's plan of care, Yassa included other, ineffective treatments with higher reimbursement rates that were not designed to help the patient regain his full range of motion.

77.     Yassa included ineffective and costlier treatments in the patient's plan of care with the goal of maximizing DPT's profits at the expense of the patient and the United States.

78. Consistent with DPT's standard practices, the patient was treated subsequently by a PTA who was unable to change the treatment plan. As a result, the patient did not receive appropriate care.

79. Approximately six (6) weeks after the surgery, Ms. Schmidt met with the patient to perform a re-evaluation and observed that the patient's shoulder was rigid and resistant to movement with passive range of motion. Ms. Schmidt changed the patient's plan of care to include range of motion as the patient's primary treatment goal, as Yassa should have done from the outset.

**Knowing submission of false claims to CMS.**

80. Physical therapy providers use the American Medical Association's Current Procedural Terminology (CPT) manual to determine the correct code to be billed for services rendered to a patient. The CPT manual contains a five-digit code for nearly every type of medical service. The codes relevant to this case state that the physical therapist is "required to have direct (one-on-one) patient contact" while the therapeutic procedure is being rendered. Current Procedural Terminology, "Therapeutic Procedures" (codes 97110-97533), American Medical Association (2013). These therapy codes contain a time element of 15 minutes for each procedure.

81. When a physical therapist, including Yassa, billed for a physical therapy session, the physical therapist used a "superbill" to record the billing entry. The "superbill" included CPT codes already printed on the form and the physical therapist entered "1," "2," "3," or "4" to record the number of units of billing.

82. Yassa then used the information on the superbill (frequently after altering superbills that had already completed by the physical therapist) to complete form HCFA-1500 or an elec-

tronic equivalent to seek reimbursement from Medicare and Medicaid. HCFA-1500 states: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision." Completing this certification or an electronic equivalent is a precondition to Medicare reimbursement. 42 C.F.R. § 424.32.

83. Yassa utilized the CPT code 97113 for patients who received group aquatic therapy sessions despite that code requires one-on-one patient contact, which cannot be provided in a group setting. On information and belief, Yassa utilized CPT codes 97110-97533 to seek reimbursement for 15-minute treatments that neither Yassa nor his employees at DPT performed. Yassa or an authorized representing signing on behalf of Yassa signed each HCFA-1500 falsely attesting that he or an employee under his supervision at DPT performed therapy sessions that did not occur or were improperly categorized under the wrong CPT code.

84. DPT charged Tri-Care for services that were not performed or for different services than what the patient actually received.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violations of 31 U.S.C. § 3729(a)(1)(A))

85. Ms. Schmidt incorporates all of the allegations made in this Complaint.

86. Dynamic Physical Therapy and Yassa knowingly took the actions detailed herein to: (1) charge for services not actually rendered; (2) upcode services actually rendered to services not actually rendered with higher reimbursement rates; and (3) charge for services that were medically unnecessary. These actions created false claims to the United States. The claims were false

because services did not occur, services occurred but were billed as different services for higher reimbursements, and/or medically unnecessary services occurred.

87. The Defendants regularly submitted or caused to be submitted charges for such activities to programs funded by the United States, including Medicare, Medicaid, and Tricare.

88. Defendants' false claims were material the United States' decision to issue payments to Defendants.

89. For each of these submissions, Defendants are liable under 31 U.S.C. § 3729(a)(1)(A) for false claims presented to the United States.

90. As such, the Defendants are liable for three (3) times the amount of damages suffered by the United States in an amount to be determined at trial, plus a civil fine of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim submitted to the United States.

### SECOND CLAIM FOR RELIEF
### (Violations of 31 U.S.C. § 3729(a)(1)(B))

91. Ms. Schmidt incorporates all of the allegations made in this Complaint.

92. In pursuit of the false claims described above, the Defendants knowingly created false statements and records in violation of 31 U.S.C. § 3729(a)(1)(B). Defendants knowingly falsified bills and medical charts.

93. Defendants' false statements were material to the Unites States' decisions to issue payments to Defendants.

94. As such, the Defendants are liable for three (3) times the amount of damages suffered by the United States in an amount to be determined at trial, plus a civil fine of between $5,500

and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim submitted to the United States.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff-Relator, on her own behalf and on behalf of the United States of America, prays as follows:

1. That this Court enter judgment against all Defendants in an amount equal to three (3) times the total amount of damages sustained by the United States as a result of the fraudulent conduct described in this Complaint, including but not limited to the full value of all false claims presented by Defendants to Medicare, Medicaid, Tricare, and any other insurance program administered or funded by the United States;

2. That because all Defendants are responsible for submitted false claims using false records or statements to achieve payment, and using false statements to avoid and conceal their obligation to repay funds they have wrongfully obtained, all Defendants are jointly and severally liable for the full amount of damages and civil or criminal penalties awarded in this case;

3. That each and every Defendant be held jointly and severally liable for a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim described herein and presented to, or approved by, the United States;

4. That the Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than fifteen percent (15%) nor more than thirty percent (30%) of the proceeds awarded to the United States from a judgment in this action, settlement of any claims, and/or al-

ternative remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3730(c)(5) & (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

5.   That the Plaintiff-Relator and the United States be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

6.   That the Plaintiff-Relator and the United States be awarded pre- and post-judgment interest on all monies awarded; and

7.   That the Plaintiff-Relator and the United States be granted all other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

The Plaintiff-Relator requests a jury trial on all material issues.

Respectfully submitted this 9th day of April, 2019 by:

| **SWAIN LAW, LLC** | **LOWREY PARADY, LLC** |
|---|---|
| */s/ Hunter A. Swain* | */s/ J. Bennett Lebsack* |
| Hunter A. Swain | J. Bennett Lebsack |
| 1721 High Street, #1 | 1725 High Street |
| Denver, CO 80218 | Denver, CO 80218 |
| Telephone: (720) 815-5281 | Telephone: (303) 593-2595 |
| Email: hunter@swainemploymentlaw.com | Fax: (303) 502-9119 |
| | E-mail: Ben@lowrey-parady.com |
| *Attorney for Plaintiff* | *Attorney for Plaintiff* |

Plaintiff's Address:   Jennifer Moehring-Schmidt
172 Brentwood Drive
Fort Thomas, KY 41075